**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **DYANNA GREEN,** | : | Civil Case Number |
| *Plaintiff*, | : | |
| | : | **3:16-cv-00321 (VLB)** |
| **v.** | : | |
| | : | **December 19, 2017** |
| **EAST HAVEN POLICE DEP'T,** | : | |
| **TOWN OF EAST HAVEN,** | : | |
| *Defendants.* | : | |

**MEMORANDUM OF DECISION GRANTING MOTION FOR SUMMARY JUDGMENT**
**[DKT. 49]**

This case involves an employment discrimination action brought by Plaintiff Dyanna Green ("Plaintiff" or "Green") who served as a records attendant for the East Haven Police Department ("EHPD") for approximately 13 years. Plaintiff contends Defendant Town of East Haven ("Defendant" or "Town") discriminated against her on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Conn. Gen. Stat. § 46a-60, *et seq.* Defendant moves Motion for Summary Judgment, arguing that certain alleged discriminatory acts are time-barred and that Plaintiff fails to establish a prima facie case for relief. [Dkt. 49]. For the foregoing reasons, this motion is GRANTED.

**Background**

The following facts are derived from the parties' undisputed Local Rule 56(a)(1) and 56(a)(2) statements and evidence on the record. In May 2001 at the age of 47, Plaintiff Green began her employment with East Haven Police Department, where she worked as a records attendant for approximately 13 years. [Dkt. 49-2 (D. Conn. Civ. L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 54-10 (D. Conn. Civ. L. R.

56(a)(2) Stmt.) ¶ 1]. Her duties included processing arrest and accident reports, typing search and arrest warrants as well as misdemeanor and infraction tickets, and entering data into the EHPD system. [Dkt. 49-2 ¶ 2; Dkt. 54-10 ¶ 2]. Plaintiff and Sandy Depoto worked together as the sole full-time records attendants from her start date to Ms. Depoto's retirement in 2012. [Dkt. 54-9 (Pl.'s Aff.) ¶6]. Denise Spallone also joined the team as a part-time records attendant in approximately 2007. *Id.* After Ms. Depoto retired in 2012, Jennifer Ward was hired as her replacement. [Dkt. 49-2 ¶ 6; Dkt. 54-10 ¶ 6]. Plaintiff contends Ms. Ward was approximately 30 years old at the time she was hired. *See* [Dkt. 54-9 ¶ 7]. At no time relevant to this decision was there a position titled "senior" records attendant. [Dkt. 49-2 ¶ 5; Dkt. 54-10 ¶ 5].

The EHPD underwent senior managerial and policy changes beginning in 2012 that impacted the Records Department. Brent Larrabee was appointed Chief of Police in 2012, [Dkt. 54-9 ¶ 7], and he appointed Lieutenant David Emerman as Supervisor of the Records Division to replace Captain Joe Slane, [Dkt. 49-2 ¶ 3; Dkt. 54-10 ¶ 3; *see* Dkt. 49-4 (Emerman Dep.) at 10:7-:11-5]. Officer James Naccarato joined the EHPD in 2012, [Dkt. 49-8 (Mot. Summ. J. Ex. 6, Naccarato Dep.) at 6:1-12], and was the Internal Affairs Officer at all times relevant to this case. [Dkt. 49-2 ¶ 10; Dkt. 54-10 ¶ 10].

The EHPD had formal policies and procedures governing internal affairs, including a Code of Conduct and an internal affairs investigation process. [Dkt. 49-2 ¶¶ 11-12; Dkt. 54-10 ¶¶ 11-12]. Part of Officer Naccarato's role entailed investigating violations of these policies and procedures. [Dkt. 49-2 ¶ 13; Dkt. 54-

10 ¶ 13]. EHPD's policy on Internal Affairs Officer and Complaints provides, "[t]he Police Chief has the authority to determine the merits of an investigation" and discipline an employee accordingly. [Dkt. 49-9 (Mot. Summ. J. Ex. 7 (Policy 208.2) at 14 of PDF; *see* Dkt. 49-2 ¶¶ 29-30; Dkt. 54-10 ¶¶ 29-30].

Termination was a multi-step process. After an internal affairs investigation the Police Chief had the authority to issue a "verbal reprimand, written reprimand (warning), suspension, [and to] enter into negotiation with the Union regarding alternate types of discipline or corrective alternatives." [Dkt. 4-4 at 14 of PDF]. But if allegations were more serious, the Police Chief could then refer the investigation to the Board of Police Commissioners ("BPC"). [Dkt. 49-9 at 14 of PDF; *see* Dkt. 49-2 ¶¶ 30-32; Dkt. 54-10 ¶¶ 30-32]. The BPC had "authority to suspend without pay for an unlimited period of time, dismiss, reduce the charges, or terminate the employee" and was to conduct a "full Board hearing during which evidence [would be] presented." [Dkt. 49-9 at 14 of PDF; *see* Dkt. 49-2 ¶¶ 33-34; Dkt. 54-10 ¶¶ 33-34].

Plaintiff also experienced a few changes to her employment over the couple of years after Ms. Depoto's retirement and prior to her own retirement. In April 2013, Plaintiff's hours were altered; her start time was moved back one hour from 7:00 am to 8:00 am and her end time moved back from 3:00 pm to 4:00 pm. [Dkt. 49-2 ¶ 7; Dkt. 54-10 ¶ 7]. On September 29, 2014, the job responsibilities of Plaintiff and Ms. Ward were switched. [Dkt. 49-2 ¶ 8; Dkt. 54-10 ¶ 8]. On October 10, 2014, Plaintiff requested to come into work early after a long weekend, [Dkt.

49-2 ¶ 9; Dkt. 54-10 ¶ 9; Dkt. 49-7 (E-mail 10/10/14)], and she stated the following reasons:

> Dave, past practice in the records room since I have been here, 13+ years, and for the years before, the senior clerk always had first choice of coming in early after a long weekend. So, my question is if you would like me to first organize the paperwork for Jen to begin processing when she comes in and then attend to my other duties, or just work on my regular duties instead?

[Dkt. 49-7]. Lieutenant Emerman instructed her to report according to her regular duties. *Id.*

### I.  Incident Leading to Suspension

On Friday, December 5, 2014, an incident occurred giving rise to Plaintiff's placement on administrative leave with pay.[1]  [Dkt. 49-2 ¶ 14; Dkt. 54-10 ¶ 14]. Plaintiff took without permission a can of biscuits from the refrigerator and a basket from the kitchen area.  [Dkt. 49-2 ¶¶ 18-20; Dkt. 54-10 ¶¶ 18-20].  She believed the biscuits were for communal use or were abandoned (she planned to cook them for the office over the weekend), and she intended to borrow the basket as she had previously done and observed other employees do the same. [Dkt. 54-9 ¶¶ 21-22].  In the early afternoon, Lieutenant Murgo sent an email to the EHPD employees:

> We had two (2) canisters of Buttermilk flavored Pillsbury biscuits that was brought in on Thanksgiving by one of our officers.  There is now one canister left, which means one canister grew legs and walked away.  If YOU are in possession of Pillsbury Grands Flaky layers Buttermilk biscuits, please return them to their rightful owner. We work in a police department people.  Too many things grow legs here.  Thank you.

---

[1] The following details stem from Officer Naccarato's interview of Plaintiff, in the presence of a union representative, on December 11, 2014, as well as other evidence in the record.  *See* [Dkt. 49-2 ¶¶ 15-16; Dkt. 54-10 ¶¶ 15-16].

[Dkt. 54-2 (Opp'n Ex. 1, E-mail 12/05/14)]. After receiving this e-mail, Plaintiff asked Lieutenant Emerman if there were cameras in the kitchen. [Dkt. 49-2 ¶ 21; Dkt. 54-10 ¶ 21].

Plaintiff attempted to return the biscuits to the refrigerator, but when she arrived in the kitchen carrying the biscuits in a bag she discovered the refrigerator covered with yellow tape and a "crime scene" sign. [Dkt. 49-2 ¶ 22; Dkt. 54-10 ¶ 22; Dkt. 54-3 (Opp'n Ex. 4, Photographs); Dkt. 54-9 ¶ 27]. Chief Larrabee confronted Plaintiff and inquired about the contents of her bag, to which she responded that the bag contained her salad. [Dkt. 54-9 ¶ 29]. Plaintiff contends that Chief Larrabee looked in the bag, saw the can of biscuits, and escorted her back to her work station. *Id.* According to Plaintiff, Chief Larrabee then noticed another bag near her desk containing the wire basket, and Plaintiff explained that she intended to use it over the weekend for a Hannukah party. *Id.* She was then advised to leave the office and contact her union representative. *Id.* Plaintiff maintains that food and kitchen items are "regularly borrowed, misplaced or taken from the EHPD's communal refrigerator and breakroom" but never has anyone sent e-mails or used crime scene tape and a sign in response. *Id.* ¶ 26.

## II. Subsequent Investigation

On the same day of the incident, Officer Naccarato visited Plaintiff's home with forms documenting her suspension with pay. [Dkt. 54-9 ¶ 30; Dkt. 54-7 (Opp'n Ex. 7, Investigation Report) at 2 of PDF ("At approximately 1535 hours I went to Dyanna's home . . . to get her department keys and have her sign her notice of suspension."); [Dkt. 49-11 (Mot. Summ. J. Ex. 9, Admin. Leave Notice)

(establishing suspension with pay during pendency of internal investigation)]. He thereafter interviewed Plaintiff on December 11, 2014, which uncovered information about the December 5 incident as stated above. [Dkt. 49-12 (Mot. Summ. J. Ex. 10, Interview Tr.)]. During this interview, Plaintiff explained she felt "kind of negative things" from Chief Larrabee within the first few weeks of his joining the office. *Id.* at 13 of PDF. She recognized she was "obviously not a JEN and . . . not a MARCIA" but that she put in over 13 years of work and no one had ever told her that officers could not trust her. *Id.* Plaintiff referenced her volunteer activities for the union and overall commitment to the EHPD community. *Id.* Officer Naccarato ultimately concluded that Plaintiff violated the Code of Conduct by engaging in "unbecoming conduct," which is defined as "[a]ny willful action or conduct which impedes the Department's efforts to achieve its goals, values, or beliefs as stated in the mission statement and code of ethics, brings discredit on the Department, or impairs the operation or efficiency of the Department or any member." *See* [Dkt. 49-8 at 115:1-116:8; Dkt. 49-10 (Mot. Summ. J. Ex. 8, Policy 203.1) at 8 of PDF]. Officer Naccarato believes discipline includes "up to termination." [Dkt. 49-8 at 116:4-5].

Plaintiff avers that she spoke with Officer Naccarato after the interview and asked him "what was going to happen to [her]." [Dkt. 54-9 ¶ 31]. Officer Naccarato purportedly stated, (1) that she had stolen from the EHPD, (2) that "Chief Larrabee and other members of the EHPD no longer trusted [her] or wanted [her] to continue working at the EHPD, (3) that her termination was likely, and (4) she should retire or resign if it was possible. *Id.* Officer Naccarato does

not remember this conversation, but stated in his deposition, "[I]f she asked me, I would have told her what I thought." [Dkt. 49-8 at 34:17-18]. He would have told her, "[I]t's stealing from a police department, you have the potential to get fired for it. We have a disciplinary matrix that we go by and that's where it falls in there." *Id.* at 35:8-11. He also opined that he "can't definitely say [she] would get fired or wouldn't get fired" because neither he nor Chief Larrabee had the discretion to make that call. *Id.* at 35:20-25.

Officer Naccarato also confirmed that Chief Larrabee mentioned to him the prospect of filing a criminal complaint because the incident constituted theft, but that at some point shortly after her retirement "[i]t was discussed briefly and decided not to go that way."[2] *Id.* at 83:16-84:17.

Plaintiff states that she met with her union representatives, Sandy Santos and Tom Fascio, on December 15, 2014. [Dkt. 54-9 ¶ 33]. Mr. Fascio communicated the Town's position "that [she] could either retire or more forward with the L[o]udermill hearing." *Id.* ¶ 34. He also "advised [her], based on his discussions with the Town's representatives, including Chief Larrabee, [she] would almost certainly lose a L[o]udermill hearing." *Id.* Plaintiff determined she must retire in consideration of Officer Naccarato's statements and her union representative's statements. *Id.* Submitted into evidence is a letter dated December 15, 2014, stating, "I Dyanna Green, hereby retire from the Town of East Haven, effective January 1st 2015." [Dkt. 49-13 (Mot. Summ. J. Ex. 11 (Retirement Letter)].

---

[2] **Officer Naccarato indicated he does not know who made this decision.** *Id.*

Plaintiff filed an EEOC complaint on September 24, 2015. [Dkt. 49-15 (Mot. Summ. J. Ex. 13, EEOC Compl.)].

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

<u>Analysis</u>

Defendant raises a failure to exhaust remedies defense as to certain discriminatory acts that occurred outside the limitations period. Defendant also moves for summary judgment in its entirety on the grounds that Plaintiff cannot establish an adverse employment action of constructive discharge. The Court analyzes the ADEA and CFEPA claims together as the relevant Connecticut employment discrimination law is based on its federal counterpart.[3]

---

[3] Courts routinely group federal and state employment discrimination claims together when addressing the exhaustion of remedies and the merits in the manner at issue in this case. *See Hayes v. Compass Grp. USA, Inc.*, 343 F. Supp. 2d 112, 118 n.2 (D. Conn. 2004) ("Because Connecticut law in relevant part follows the ADEA, the court considers Hayes's CFEPA claim together with his ADEA claim on the basis of federal precedent.") (citing *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103, 107–111 (1996)); *Rubinow v. Boehringer Ingelheim Pharm., Inc.*, 496 F. App'x 117 (2d Cir. 2012) ("Summary judgment motions in age discrimination cases under the ADEA and CFEPA are

I.    <u>Statute of Limitations</u>

Defendant argues that Plaintiff cannot recover for Defendant's changes to her hours and job responsibilities because she did not raise these claims in her EEOC action and thus they are time-barred.    Plaintiff maintains that all discriminatory actions in this case can be considered under the continuing violation doctrine.

The ADEA requires a claimant to file a discrimination charge with the EEOC within 180 days "after the alleged unlawful employment [action] occurred" or, if claimant has already filed a charge with state or local equal employment agency, within 300 days of the alleged act of discrimination.    29 U.S.C. § 626(d)(1). Connecticut has its own anti-discrimination laws and enforcement agency, and it also generally limits filing to within 180 days.    *See* Conn. Gen. Stat. § 46a-82(f) (providing an individual the opportunity to file a complaint with the Commission on Human Rights and Opportunities ("CHRO") within 180 days of the unlawful employment action or within 30 days of an alleged violation of Conn. Gen. Stat. § 46a-80(a)).

---

decided using the *McDonnell Douglas* burden-shifting test."); *Maloney v. Connecticut Orthopedics, P.C.*, 47 F. Supp. 2d 244, (D. Conn. 1999) (addressing the exhaustion of remedies as one issue with respect to a Title VII claim and a CFEPA claim); *Davenport v. Norwalk Bd. of Educ.*, 866 F. Supp. 2d 101, 107 (D. Conn. 2012) (using one analysis for constructive discharge allegations brought under CFEPA and the ADEA); *see also Gauba v. Travelers Rental Co., Inc.*, No. 3:12-cv-1713 (SRU), 2015 WL 1004309, at *4 (D. Conn. Mar. 5, 2015) (looking to "federal law for guidance on the interpretation of state law" in applying the continuing violation doctrine to a CFEPA claim brought before the district court under diversity jurisdiction) (citing *Connecticut v. Comm'n on Human Rights & Opportunities*, 211 Conn. 464, 469-70 (1989)).

The Supreme Court recognizes a continuing violation exception in ADEA cases where a discriminatory act does not fall within the EEOC statute of limitations period.[4]  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).  Under this principle, a plaintiff's "timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination" will extend the statute of limitations period for any other claims of discrimination committed under that policy that are otherwise barred by the limitations period if standing alone.  *Id.*  The continuing violation exception applies when there exists evidence of specific discriminatory practices like "the repeated use of discriminatory seniority lists or employment tests."  *Id.*  Typically discrete incidents "unrelated to an identifiable policy or practice" will not suffice as a continuing violation unless they are "*specifically* related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice."  *Id.* (emphasis added); *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (acknowledging "acts so isolated in time . . . from each other . . . [or] from the timely allegations[ ] as to break the asserted continuum of discrimination will not suffice" but recognizing a continuing violation is viable where it relates to "specific and related instances of discrimination" unremedied long enough to constitute a discriminatory policy or practice) (internal quotation marks and citations omitted).  Conduct that is "reasonably related," or within the

---

[4] The continuing violation exception is also recognized for Title VII cases, *id.*, and as such the Court will refer to legal principles set forth in Title VII cases where applicable. *See Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) ("As the administrative exhaustion requirement is the same under the ADEA as it is under Title VII, we find that such exceptions also apply to claims brought pursuant to the ADEA.").

scope of the EEOC investigation, may be considered a continuing violation. *Fitzgerald*, 251 F.3d at 259-60. Put another way, "[s]uccessive conduct that is part of a continuing wrong is by its very nature 'reasonably related' to the earlier conduct." *Id.* at 360.

It is well established that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Wade v. New York City Dep't of Educ.*, 667 F. App'x 311, 312 (2d Cir. 2016) (applying *Morgan* to an ADEA claim); *Krish v. Connecticut Ear, Nose & Throat, Sinus & Allergy Specialists, P.C.*, 607 F. Supp. 2d 324, 330 (D. Conn. 2009) (discussing *Morgan* in an ADEA claim). Conversely, an individual is not barred from bringing *timely* discrete acts before the EEOC that are related to past, untimely acts. *Id.* The underlying principle therefore is: each *discrete act* starts a new clock and must be filed within the proper limitations period. *Morgan*, 536 U.S. at 113.

For the purposes of filing an EEOC charge, a discrete, discriminatory act "occurs" on the day that the event happens. *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 239 (2d Cir. 2007) (quoting *Morgan*, 536 U.S. 101, 110 (2002)). Easily identifiable examples of discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire. . . ." *Morgan*, 536 U.S. at 114 (addressing the continuing violation exception in a Title VII case); *Lightfoot*, 110 F.3d at 907 (acknowledging "termination through discharge or resignation" are completed acts that cannot be characterized as continuous). Other examples include a "discontinuance of a particular job assignment" and, relatedly, changes

to work stations and work shifts.  *See Kassner*, 496 F.3d at 239; *Lightfoot*, 110 F.3d at 907 (recognizing "a job transfer, or discontinuance of a particular job assignment" are not continuing violations); *MacDonnell v. Liberty Cent. Sch. Dist.*, 115 F. App'x 489, 491 (2d Cir. 2004) (stating a job responsibility change is a discrete act not constituting a continuing violation); *Gaffney v. Village of Mamaroneck Police Dep't*, No. 2016 WL 4547499, at *4 (S.D.N.Y. Aug. 31, 2016) ("Thus, Plaintiff's demotions and reductions in responsibility, which are untimely, are not revived simply because Chief Leahy later referred to their result."); *see also Delrio v. Univ. of Connecticut Health Care*, 292 F. Supp. 2d 412, 420 (D. Conn. 2003) ("[I]t is well settled law in the Second Circuit that 'discrete acts' include discriminatory transfers, job assignments and non promotions, and failure to compensate adequately.").  Accordingly, the Court concludes Defendant's changes to Plaintiff's schedule and job responsibilities are "discrete acts."

The Court also finds that these discrete acts are not specifically related to the point that they constitute an unremedied discriminatory policy or practice. Defendant changed Plaintiff's hours on some date in April 2013.  [Dkt. 49-2 ¶ 7; Dkt. 54-10 ¶ 7].  Her job roles were switched over a year later on September 29, 2014.  [Dkt. 49-2 ¶ 8; Dkt. 54-10 ¶ 8].  Thereafter on October 10, 2014, Plaintiff made a request to work at the office during a specific schedule and the request was denied the same day.  [Dkt. 49-2 ¶ 8; Dkt. 54-10 ¶ 9].  While two of these three instances relate to Plaintiff's work schedule, they are too isolated in time to constitute one "continuum of discrimination."  *See Fitzgerald*, 251 F.3d at 359. Moreover, these three alleged discriminatory acts are wholly unrelated to the

subject matter of the timely EEOC claim: her alleged forced retirement. They therefore are not "reasonably related" and cannot be considered part of an "ongoing policy." *Lightfoot*, 110 F.3d at 907.

Although these prior discrete acts cannot be factored into Plaintiff's recovery, the Court notes that they can nonetheless be considered as evidence going to the merits, because an employee can still use "the prior acts as background evidence in support of a timely claim" even where certain discriminatory acts are time-barred. *Morgan*, 536 U.S. at 113.

## II.   The Merits

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's prohibition against discrimination based on age protects employees who are at least forty years of age. 29 U.S.C. § 631(a).

Claims of discriminatory treatment under the ADEA are analyzed using the burden-shifting framework set forth in *McDonnell Douglas* as modified by the Supreme Court's subsequent decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit"). Under *McDonnell Douglas*, a *prima facie* case of discrimination consists of proof that a plaintiff (1) was within a protected

class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Id.* at 107. Even at the summary judgment phase, where a plaintiff must put forth evidence in support of each of these elements, the "plaintiff's *prima facie* burden [i]s minimal and *de minimis.*" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks omitted). However, "[t]he inference of impermissible discrimination, in order to survive summary judgment, must be reasonable." *Thomesen v. West*, No. 99-CV-3035 (NGG) (TEB), 2001 WL 1636311, at *4 (E.D.N.Y. Dec. 20, 2001) ("The Second Circuit has upheld summary judgment for employers on the grounds that the facts submitted by the plaintiff do not give rise to a reasonable inference of discrimination.") (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d Cir. 1999)).

After the plaintiff has met the initial burden of establishing his *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *McDonnell Douglas*, 411 U.S. at 802. "Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Gorzynski*, 596 F.3d at 106. However, at this step, *"Gross* makes clear that 'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse

employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 557 U.S. at 180).

    A.  <u>Prima Facie *Case*</u>

Defendant challenges, and therefore the Court will address, only the third factor of the *prima facie* stage of the *McDonnell Douglas* analysis. The parties' dispute is centered on whether Plaintiff can bring a constructive discharge claim when she resigned prior to disputing the accusations at a hearing.

An "adverse employment action" is one that causes a "materially adverse change in the terms and conditions of employment." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe R.R. v. White*, 548 U.S. 53, (2006). To be material, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

One example of a materially adverse action is constructive discharge. *See Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 359 (2d Cir. 1993). "An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Ashcroft*, 336 F.3d at 151-52. Intolerable working conditions are those that "when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 152 (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). An employee cannot, however, show constructive discharge merely through evidence of her dissatisfaction with

assignments, by contending that her "work has been unfairly criticized," or by showing "working conditions were difficult or unpleasant." *Stetson*, 995 F.2d at 360. It is also insufficient for a plaintiff merely to resign to avoid facing disciplinary charges or to fear termination. *See Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 178 (E.D.N.Y. 2013).

Threats of termination can constitute evidence of constructive discharge. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding "ample evidence" demonstrated a triable issue of fact that plaintiff was constructively discharged because plaintiff was notified "he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance"); *Dall*, 966 F. Supp. 2d at 177-78 ("[T]hreats of termination may be sufficient to show constructive discharge."). Courts within this circuit have held that evidence an employee was given the choice to either resign or be fired can be sufficient to create a triable issue of fact. *See Rupert v. City of Rochester, Dep't of Environ. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010); *Dall*, 966 F. Supp. 2d at 178. When determining if a threat of termination is sufficient, courts have relied on factors including "whether the threats of termination were repeated, direct, or involved additional adverse conduct." *See Dall*, 966 F. Supp. 2d at 178 (collecting cases).

However, there also exists a contrasting principle that often precludes a plaintiff's ability to survive summary judgment: a plaintiff's failure to go through an available pre-termination hearing process is evidence that she was not constructively discharged. *See, e.g., Silverman v. City of New York*, 216 F. Supp.

2d 108, 115 (E.D.N.Y. 2002) ("[C]ourts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof."); *Dall*, 966 F. Supp. 2d at 180 (clarifying that courts finding no constructive discharge are typically presented with "circumstances in which the plaintiff had access to a hearing prior to termination or had reason to believe that after-the-fact grievance procedures might be successful"); *Collazo v. Cnty. of Suffolk*, 163 F. Supp. 3d 27, 46 (E.D.N.Y. 2016) (acknowledging courts typically refuse to find constructive discharge when there exists an avenue to redress a wrong and the plaintiff fails to go through the process); *Bailey v. New York City Bd. of Educ.*, 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007) ("Moreover, when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge."); *Stembridge v. City of New* York, 88 F. Supp. 2d 276, 285 (S.D.N.Y. 2000) (finding no constructive discharge where plaintiff had the opportunity to go through a scheduled disciplinary hearing about his suspension but instead chose to resign); *Weinstein v. Garden City Union Free Sch. Dist.*, No. CV 11-25099AKT), 2013 WL 5507153, at *27 (E.D.N.Y. Sept. 30, 2013) ("Here, Plaintiff could have availed himself of the grievance procedures set forth in his union's collective bargaining agreement before resigning."); *Katz v. Beth Israel Med. Ctr.*, No. 95 Civ. 7183 (AGS), 2001 WL 11064, at *13 (S.D.N.Y. Jan. 4, 2001) ("A factfinder would have to conclude that a reasonable person in Ms. Katz's situation would have seen filing a grievance as a viable alternative to resigning.").

Illustrative of a case in which a court found a reasonable person would have believed that the outcome of the hearing was a foregone conclusion and that pursuing a grievance process was not a viable alternative to resignation is *Gorham v. Town of Trumbull Bd. of Educ.*, 7 F. Supp. 3d 218 (D. Conn. 2014). In that case the plaintiff demonstrated constructive discharge notwithstanding his failure to complete his disciplinary hearing process. Plaintiff was a night custodian for a high school who was suspended for taking home a student's saxophone he found in the garbage. *Id.* at 223. The custodial staff was directed *not* to take items home from the Lost and Found and to place the items in a bag for Goodwill donations when they overflowed into the hallway. *Id.* Gorham believed the saxophone to be discarded because he found it in the garbage and intended to donate the item to his church. *Id.* at 224. The school instituted an investigation and held a disciplinary hearing, charging him with "theft of items belonging to a public entity," "dishonesty and lying to [his] supervisors," and "violation of the trust inherent in his position." *Id.* at 225. He was informed that possible discipline included suspension or termination. *Id.* The Board of Education plant administrator was alleged to have told him at the disciplinary hearing, "Lester, you're better off resigning right now; if not, we'll have you charged." *Id.* at 232. The plaintiff also averred that his union representative stated, "Lester, this is tough. If you don't . . . resign, they'll not only have you charged; even if you feel like you're right. . . you'll still be messed up." *Id.* The plaintiff resigned on the day of the hearing. *Id.* The court found the evidence sufficient to constitute constructive discharge because "a reasonable person in

Gorham's shoes would have felt compelled to resign." *Id.* In short, during the hearing one of the decision makers and his union representative essentially told Gorham the outcome of the hearing would be unfavorable and advised him to resign immediately before the decision was rendered.

In analyzing a constructive discharge claim, the Court must carefully balance the facts to determine whether a reasonable person would have considered the pre-termination hearing a meaningful process or a formality with a predetermined negative outcome. The analysis of the facts in this case reveals that the plaintiff chose to resign despite having a viable pre-termination hearing process. This is for two reasons. First, Plaintiff had no basis to prejudge the decision makers. Although Officer Naccarato found that she had violated the Code of Conduct, that she was found to have committed an act for which she could be terminated, that Chief Larrabee and others did not trust or want to work with her, and that he thought she should resign, neither he nor Chief Larrabee were decision makers. Neither person who advised her had the authority to terminate her.

Second, EHPD Policy Number 208.2 makes clear that only the BPC has the authority to terminate an employee and may do so only after a full evidentiary Board hearing. [Dkt. 49-9 at 14 of PDF]. At such a hearing Plaintiff could have offered the testimony of her longstanding coworkers demonstrating that her conduct was conventional. That process had not begun and no one advised Plaintiff of the likely outcome of that process. Indeed, a reasonable person in Plaintiff's shoes would not have concluded it was *inevitable* that she would be

fired after speaking with someone uninvolved in the decisionmaking process. *See* [Dkt. 54-9 ¶ 32 (wherein Plaintiff avers "Based on this conversation [with Officer Naccarato], I understood that as a result of [his] incorrect determination that I engaged in a theft, it was inevitable that I would be fired under the EHPD's disciplinary matrix, and that my only option would be to retire."].

It is also unavailing that her union representative advised her "the Town's position was that [she] could either retire or move forward with a L[o]udermill hearing" but that she "would almost certainly lose a L[o]udermill hearing." *Id.* ¶ 34. In light of the fact that there is no evidence Plaintiff's termination was automatic, the loss of a Loudermill hearing would not have inevitably led to termination. These statements appear to be nothing more than an educated guess about a certain outcome. Unlike the plant administrator in *Gorham*, nobody gave Plaintiff an ultimatum or threatened her with criminal charges, and there is no evidence the final decision maker would have even terminated her employment. The Court finds that Plaintiff's case falls more closely in line with the typical pre-termination cases, and she cannot show constructive discharge because she elected on her own to forego a hearing made available to her. *See Silverman*, 216 F. Supp. 2d at 116 ("Thus, the fact that Silverman could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation.").

**B.** *Second and Third Factors*

Neither party has briefed the second or third factors of the *McDonnell Douglas* test. Accordingly, the Court need not go any further in the analysis.

## Conclusion

In failing to establish an adverse employment action, Plaintiff cannot establish a *prima facie* case for her ADEA or CFEPA claims. Therefore, summary judgment is GRANTED. The Clerk is directed to close the case.


IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Order dated in Hartford, Connecticut on December 19, 2017.